# EXHIBIT A

Robbie D. Jones

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
ROBBIE D. JONES,                )
                                )
        Plaintiff,              )
                                )
v.                              )
                                )   Civil Action No.
COMMISSIONER STAN TAYLOR,       )   04-1523-JJF
WARDEN RICK KEARNEY,            )
SGT. BARRY BILES, and TEANNA    )
BANKS,                          )
                                )
        Defendants.             )
```

    Deposition of ROBBIE D. JONES taken pursuant to notice at the Sussex Correctional Institute, Georgetown, Delaware, beginning at 1:25 p.m. on Wednesday, June 13, 2007, before Robert Wayne Wilcox, Jr., Registered Professional Reporter and Notary Public.

APPEARANCES:

    ROBBIE D. JONES (pro se)
    SBI# 313356
      Sussex Correctional Institute
      Georgetown, Delaware  19947
      for himself,

    STACEY XARHOULAKOS, ESQ.
    STATE OF DELAWARE DEPARTMENT OF JUSTICE
      820 North French Street - 6th Floor
      Wilmington, Delaware  19801
      for the Defendants.

ALSO PRESENT:  SHANE TOWNSEND, SCI

CORBETT & WILCOX
230 North Market Street - Wilmington, Delaware 19801
(302) 571-0510

Corbett & Wilcox is not affiliated
with Wilcox & Fetzer, Court Reporters

Page 30

1  Q. But I'm just trying to understand if you
2  really know what Commissioner Taylor does.
3  A. No. I didn't -- I don't understand his whole
4  job. I just -- I only understand what I see, you know,
5  and what I've been told.
6  Q. If I told you that his job was primarily
7  administrative, budgetary, would you have reason to
8  disbelieve me?
9  A. No.
10 Q. You named him as a defendant.
11 A. Yes.
12 Q. So can you just put into words for me what you
13 feel he did to violate your rights?
14 A. Basically because I wrote to -- like I said, I
15 wrote to Stan Taylor. And I told him what was going,
16 asked him to investigate it. And I named him in my
17 lawsuit because this is not a one-time event with this
18 particular person, Sergeant Biles. It's -- this is
19 ongoing. This has been going on before I came down here.
20 It was going on before it happened to me. It was -- and
21 it probably went on after it happened to me. So I felt
22 as though like he needs to be held accountable, because
23 I'm sure I'm not the only person that's ever spoken up
24 about it.

Page 31

1  Q. So did you name him because of your suit or
2  because of what you feel is happening with other people?
3  A. Because of my suit.
4  Q. How do you know that he didn't investigate?
5  A. Because he never came -- he never talked to
6  me. And my grievance was sent back in -- like I said,
7  he's not the only person that I wrote to ask can this
8  matter be looked into. And I'm not -- well, according to
9  the person's letter that wrote me, they were supposed to
10 contact him. Whether they did or not, I don't know. But
11 I assume that they did because they wouldn't have to
12 reason to write me and say we'll contact him. And
13 nothing was ever done. Nobody -- you're the first person
14 that's even came to see me about it, actually.
15 Q. Okay.
16 A. And the DCJ -- Delaware Justice Center or
17 Center for Justice -- they came to me too.
18 Q. Okay. So because of the letters that you
19 wrote to him and because no one came to talk to you is
20 why you named Stan Taylor?
21 A. No. I named Stan Taylor because, like I said,
22 this -- I feel as though it should have never happened to
23 me. Because there's a procedure that I'm sure that the
24 officers have to follow that I'm sure that he knows about

Page 32

1  or that he helped to make or -- however they go about
2  that. And like I said, I'm sure I'm not the first person
3  that spoke up about it -- almost 100 percent sure that
4  I'm not the first person who spoke up about this issue.
5  And nothing was done about it. So, like I said, it
6  should -- I named him because it shouldn't have never
7  happened to me.
8  Q. What issue?
9  A. About the assault on inmates here.
10 Q. So you're not alleging that he was personally
11 involved with assaulting you?
12 A. No.
13 Q. Okay.
14 A. No, no.
15 Q. Your allegation is just that he should have
16 done something --
17 A. Yes.
18 Q. -- to prevent it before it happened?
19 A. Yes, yes.
20 Q. Okay. What would you have wanted him to do?
21 A. Well, the first thing is I feel like if he
22 knew -- like I said, I'm going to assume that he did know
23 that this particular officer was assaulting inmates, that
24 it's been complained about before -- that this officer

Page 33

1  should have been dealt with accordingly. You know, if he
2  needs to go to counseling to find out if he has personal
3  problems or psychological problems, then so be it. Or if
4  the officer needs to be reassigned or even if the officer
5  needs to be fired. I feel as though that's what should
6  have been done.
7  Q. You say you assume that he knew. Why are you
8  under that assumption?
9  A. Because one thing that I've learned is that
10 certain behaviors -- I mean, even you dealing in the
11 justice system, you know that certain behaviors are not
12 just -- they just don't appear. You don't just start
13 doing something one day. You do it until you get caught.
14 So I'm of the assumption that I'm not the first person
15 that spoke up about this particular officer, like I said.
16 Even I witnessed with my own eyes that he has assaulted
17 other inmates in that building. And they spoke up about
18 it and nothing was done.
19 Q. Even just arguing in assuming that this
20 officer had been complained about before, what makes you
21 think that they complained to Commissioner Taylor?
22 A. Because, like I said, there's a chain that you
23 have to follow. You know, you appeal your grievances,
24 because your grievance is going to come back

Page 38

1  maced. When they was bringing him over, Biles was saying
2  something to him. He said something back. And then
3  Biles just punched him in his face.
4      Q. Did he file any grievances that you know of?
5      A. He was supposed to. I don't know if he did or
6  he didn't, because, like I said, they took me out of
7  ASDA.
8      Q. Do you know if he's filed suit?
9      A. No. He's home now on the streets.
10     Q. Okay. Who is Rick Kearney?
11     A. The warden. Well, he was the warden. I don't
12 know his title now.
13     Q. Have you ever met him?
14     A. No.
15     Q. Have you ever spoken with him?
16     A. Not personally.
17     Q. Did you write any letters to him?
18     A. Yes.
19     Q. Were these the same that were C-copied to
20 multiple people, or did you write a separate letter?
21     A. I wrote him a -- no. I wrote him a separate
22 letter explaining the whole situation to him. And I sent
23 him a copy of my grievances. And I sent him a copy of my
24 write-up. And I never heard nothing back from him.

Page 39

1      Q. Did you give me a copy of that letter with the
2  discovery I asked for?
3      A. No.
4      Q. Do you have a copy of it?
5      A. No. I never made a copy of it. No.
6      Q. What do you think he did specifically in
7  relation to this incident that violated your rights?
8      A. Failed to initiate the investigation, failed
9  to act on that investigation, had he ever done one.
10 That's it. Again, he's -- he never came and talked to me
11 to find out what happened, because I didn't just jump up
12 and file this suit. You know, I waited a while. I sent
13 letters out to these people before I filed this suit.
14 You know, if you check the dates, I believe -- I know the
15 incident happened in July. I believe my suit was filed
16 in January.
17     Q. How do you know that he didn't investigate?
18     A. Because nothing ever happened.
19     Q. Do you think just because nothing ever
20 happened that there wasn't an investigation?
21     A. Yes. Because I was put back in that same
22 building with this officer. I was never -- they never
23 came and interviewed me. They never said nothing to me.
24 They just put me back in the building with Sergeant

Page 40

1  Biles. They said if I had -- if I wanted -- actually,
2  the counselor -- I told the counselor what was going on.
3  And she said if you don't want to be in this building you
4  have to sign a protective custody. I said I'm not doing
5  that. I'm not going to sign a protective custody,
6  because protective custody -- as far as I know, you go to
7  ASDA or you come back here to behavior mod. And I'm not
8  going to lose all my rights and privileges just to get
9  away. I just got to have witnesses around whenever I
10 speak to this officer.
11     Q. So you think that since nobody talked to you
12 and nothing happened that there --
13     A. Yes.
14     Q. -- wasn't an investigation?
15     A. Yes.
16     Q. But you don't know what the warden did --
17     A. No. I don't know for sure.
18     Q. -- or did not do?
19     A. Yes. I don't know for sure.
20     Q. You were disciplined for this incident;
21 correct?
22     A. Yes.
23     Q. Now, isn't the disciplinary procedure itself a
24 form of an investigation?

Page 41

1      A. Yes, it is. Into what I did.
2      Q. Wasn't that the same incident that you were
3  disciplined for that you were suing for?
4      A. No. Because the incident report is falsified,
5  completely falsified.
6      Q. It was on the same date. Correct?
7      A. Yes.
8      Q. There's just a dispute as to what facts
9  occurred?
10     A. Yes.
11     Q. Okay. Since we're already there, I'll turn to
12 the disciplinary report. Give me one minute. We marked
13 this as Exhibit 2.
14         You've seen this before?
15     A. No.
16     Q. This is the incident report from that day.
17 Then if you'll turn the page, it has the disciplinary
18 hearing decision --
19     A. I seen the --
20     Q. -- and the appeal.
21     A. I seen this. This is the only thing I've seen
22 from any of this --
23     Q. Okay.
24     A. -- the hearing decision.

Page 50

1  he's the head nigger in charge. Just stuff along that
2  line, you know. It wasn't -- and I'm like, yo, what's
3  wrong with you? Where's this coming from?
4        And he said, "You know what you did,"
5  like I said. And he told me -- and I continued to keep
6  cool -- keep my demeanor cool. I kept my hands to my
7  side. I never made no threatening moves, because I know
8  how this dude is. So I kept -- I tried to stay as
9  nonthreatening as possible. And as I say, he told me go
10 back upstairs. So I turned around to go upstairs. And
11 he hit me. And that's exactly how it happened.
12    Q.  So you were called off your tier for no reason
13 at all, and Sergeant Biles is yelling at you, cursing at
14 you --
15    A.  Yes.
16    Q.  -- using profanity --
17    A.  Yes.
18    Q.  -- is angry.
19        And you just stood there?
20    A.  Yes.
21    Q.  You didn't say anything?
22    A.  I asked him what was it about. And that's it.
23    Q.  Did you ask him or did you yell?
24    A.  No. I asked him.

Page 51

1     Q.  Did you say anything else?
2     A.  Nope.
3     Q.  You never said anything else, and you just
4  stood there with your hands by your side. Is that what
5  you're saying?
6     A.  Yes. That's exactly what I'm saying.
7     Q.  Were you in an office?
8     A.  Yes.
9     Q.  Where were you in the office?
10    A.  I was actually in the office standing -- I was
11 standing by the chair, and he was in the doorway, because
12 I actually had to walk past him to get in the office.
13    Q.  Was Officer Banks in the office?
14    A.  No.
15    Q.  Where was she?
16    A.  Somewhere in the stair area.
17    Q.  Could you see her?
18    A.  No.
19    Q.  And Officer Seymour, where was he?
20    A.  I believe he was on the tier doing the punch.
21 Like I said, he had the punch box in one hand.
22    Q.  But in relation to where you were all
23 standing, could you see him?
24    A.  No. Not at this time.

Page 52

1     Q.  At what point were you able to see him?
2     A.  When he came to -- when he walked around the
3  table and he came to the office doorway and was like,
4  yo, come on. Come on, Barry. Stop.
5     Q.  How many inmates are on your tier?
6     A.  Forty-eight, I think, are on D tier.
7  Forty-eight or forty-four.
8     Q.  And you have no idea why of those 48 people
9  you were called into Sergeant Biles' office?
10    A.  No, ma'am.
11    Q.  Did you have a history with Sergeant Biles?
12    A.  Exchanged words. Nothing major.
13    Q.  So why do you think you?
14    A.  I don't think me. I know me, because he came
15 and did this to me for some reason or another. Like I
16 say, he didn't like me.
17    Q.  Do you have any reason to believe that they
18 might have thought you did something?
19    A.  No. Because I wasn't even -- he says in his
20 report that he walked up to me and when I seen him that I
21 left the area. But like I said, I was never outside to
22 begin with. That's the first thing. And the second
23 thing is I don't even remember seeing Sergeant Biles
24 until I came downstairs after Ms. Banks called me. I

Page 53

1  don't even remember him being outside to know anybody was
2  yelling at anybody.
3     Q.  Who were you playing basketball with?
4     A.  Shareef Harris. I only remember Shareef
5  because he was on my team. What's Barnaby's real name?
6  I'm trying to think. I had a friend named Barnaby who
7  was down here. Jermaine Mills, Andre Owens. That's
8  about all the names that I can remember specifically.
9     Q.  Okay. Where do you play basketball?
10    A.  In the gym.
11    Q.  Is that inside?
12    A.  Yes.
13    Q.  Are there outdoor courts?
14    A.  Yes. There's one outdoor court.
15    Q.  Is it next to the gym or a different location?
16    A.  It's outside of the gym alongside of it.
17    Q.  But at this time were you playing inside or
18 outside?
19    A.  I was playing inside.
20    Q.  Inside?
21    A.  Yes.
22    Q.  To get from the gym to the tier, do you have
23 to go outside?
24    A.  Yes.

Page 66

1   Q. Do they both work here?
2   A. Yes. As far as I know.
3   Q. Do they normally work together?
4   A. I couldn't answer that. I don't know.
5   Q. Have you ever seen them work together?
6   A. Work together?
7   Q. Yes.
8   A. Not that I can remember. I don't even really
9   know her son like that.
10  Q. Did you know at the time that it was her son?
11  A. No.
12  Q. Did you see any other officers when you were
13  walking?
14  A. I don't know who Unit 14 was that day, but
15  you're always going to see Unit 14, because the guard
16  post is right out there in front of the medium building.
17  And I believe Officer Jackson and Officer Banks were
18  doing pat-downs at the door.
19  Q. Officers Jackson and who?
20  A. Banks.
21  Q. Banks?
22  A. Yes. Were doing the pat-downs at the door.
23  And those were the only officers I remember seeing while
24  I was outside.

Page 67

1   Q. Did you see a nurse after the alleged
2   incident?
3   A. Yes. They took me to medical.
4   Q. Do you remember the nurse's name?
5   A. No.
6   Q. What did the nurse do?
7   A. She looked at me, and she said, "You just got
8   a little scratch on your head. You'll be all right."
9   And told them to take me to ASDA.
10  Q. You said she looked at you. Did she touch you
11  at all?
12  A. Uh-uh. No. Excuse me.
13  Q. So how did she look at the scratch on your
14  head?
15  A. It was just like -- I believe I turned my
16  head. I'm pretty sure I turned my head and showed her
17  like. And she said, "You just got a little scratch on
18  your head."
19  Q. Did she ask you to turn your head?
20  A. No.
21  Q. Did she do anything else?
22  A. She wrote something in a little book in a
23  folder. And that was it.
24  Q. Did you tell her anything else was bothering

Page 68

1   you?
2   A. Yes.
3   Q. What did you --
4   A. I told her my neck and my arm was hurting.
5   Q. What did she say?
6   A. She said, "You'll be all right" and sent me
7   out of there. She said, "Get some ice."
8   Q. Did you get ice?
9   A. Yeah. I got some ice. We were in ASDA. We
10  got an ice cooler in there. I wrapped some ice up in a
11  towel and put it on my neck.
12  Q. Do you remember how long it was after the
13  incident that you saw the nurse?
14  A. Directly after. When I left medium building,
15  they brought me to MSB building, put me in ASDA, took me
16  out of ASDA, took me to the nurse's office, and put me
17  back in ASDA.
18  Q. So would you say it was within a few minutes?
19  A. Yes.
20  Q. Who took you to the nurse?
21  A. I don't remember what officer it was. Biles
22  had dropped me off and went to do whatever he was doing.
23  It was one of the MSB officers.
24  Q. Did you walk there?

Page 69

1   A. Yes.
2   Q. How long was the walk?
3   A. A couple steps. It's not far.
4   Q. Did the nurse give you any type of medication?
5   A. No.
6   Q. Did you refuse any treatment?
7   A. No.
8   Q. What happened after you saw the nurse?
9   A. Like I said, she said I had a little scratch
10  and I would be all right. She told me to get some ice
11  for my neck and I would be all right and told them to
12  send me back to ASDA. And I went back to ASDA.
13  Q. How long did you stay in ASDA?
14  A. I believe it was two weeks, because I wrote a
15  grievance on it.
16  Q. After you saw that nurse, did you see another
17  nurse?
18  A. No.
19  Q. Did you see any nurse the next day or on
20  another shift?
21  A. No.
22  Q. Did you ask to see one?
23  A. No.
24  Q. Was anything bothering you?

Page 70

1  A. After that day, no. It wasn't a lasting
2  injury. It was just, you know, I got roughed up a little
3  bit.
4  Q. So your injuries went away after a day?
5  A. Yes. The scratch left a little mark, but it
6  wasn't...
7  Q. Okay. You said earlier that when you saw the
8  nurse at first you said your neck and arm were bothering
9  you.
10  A. Yes.
11  Q. What do you mean they were bothering you?
12  A. It was just -- it was like a throbbing, a
13  dull, throbbing pain from -- like I said, I got roughed
14  up a little bit, you know.
15  Q. That went away after a day?
16  A. Yes. It wasn't really too bad. It wasn't
17  nothing major.
18  Q. How about your arm?
19  A. My arm? I don't even think that lasted the
20  whole time. I think that was just -- it wasn't -- that
21  wasn't nothing major either. I don't even think that
22  lasted a day.
23  Q. How do you think your arm became sore, even at
24  all?

Page 71

1  A. I don't know. I just know that all in this
2  area it was hurt.
3  Q. In this area? You pointed to your shoulder
4  and arm.
5  A. From my neck to my shoulder to like my bicep.
6  All on my left side.
7  Q. So you think the arm pain was associated with
8  the neck pain?
9  A. Yes.
10  Q. Did you ever request any follow-up medical
11  treatment?
12  A. No.
13  Q. Other than those injuries we talked about, is
14  there any other injuries that you're alleging?
15  A. No.
16  Q. Okay. What are you seeking from the lawsuit?
17  A. Main monitory damages. But, more importantly,
18  I'm looking for this type of behavior to be ended,
19  because it's not right. Because, you know, I don't think
20  that I don't deserve to be punished for this -- for the
21  crime that I committed. I understand that. You know,
22  I'm a big boy. I'm a man. So I understand that you do
23  the crime, you do the time. But at the same time, you
24  know, I have to live here. I shouldn't have to be -- I

Page 72

1  shouldn't have to live in fear of this guy is going to
2  jump on me for no apparent reason one day or if he's
3  going to come in mad at whatever and take it out on me if
4  something minor happens. You know, I just -- I really
5  want to alleviate the problem. It's not about the money.
6  I want to alleviate the problem.
7  Q. Well, this is a court action. I understand
8  you asked for monetary damages. I'll ask you about that
9  in a minute. But what specifically would you want the
10  Court to do that they have the power to do?
11  A. First of all, make sure that DOC has a proper
12  training program for the officers as far as using
13  physical force is concerned, make sure that officers go
14  through psychological evaluation as far as, you know, if
15  they're having problems at home or if they suffer a death
16  in the family -- you know, stuff that should be provided
17  to them anyway, because this is stuff that people need.
18  It should be mandatory that DOC provide these type of
19  things -- you know, counseling.
20      Then if an officer does have to use
21  physical use, be it minor or be it major, you know, for
22  them to have to file a report, to go through certain
23  procedures and steps to -- after that to make sure that,
24  you know, an investigation is conducted and make sure all

Page 73

1  the facts are straight, you know. Even if it comes down
2  to interviewing inmates that was there and officers that
3  was there.
4  Q. Do you think that the officers don't receive
5  training?
6  A. Not in depth, no. I'm pretty sure they don't.
7  Q. Do you think that there's no psychological
8  evaluation?
9  A. No.
10  Q. Do you think there's no policies on the use of
11  force?
12  A. I believe there is. Is it being followed and
13  enforced? No.
14  Q. So I'm just trying -- and maybe it's because,
15  you know, we're not relating or you're not understanding
16  what the courts can do. But let's assume that there are
17  training procedures in place and there are psychological
18  evaluations and there are use-of-force policies.
19  A. Mm-hmm.
20  Q. If that were the case, what would you want the
21  Court to do?
22  A. Like I said, the problem needs to be
23  addressed. The issue needs to be addressed, you know.
24      Like I said -- I mean, let me see. How

### Page 90

1    A. At the present time, no.
2    Q. Are you complaining about your sanction?
3    A. Not as far as the lawsuit is concerned, no.
4  It was just...
5    Q. Okay. Did you just include that information
6  for factual?
7    A. Yes.
8    Q. Okay. Because then you go on to talk about
9  due process claims. From what we talked about so far, it
10 didn't sound like there were any due process claims.
11   A. Where?
12   Q. The third line.
13   A. Oh, yeah. At the time, you know -- like I
14 said, when my -- as far as my grievances were concerned,
15 I kept -- they kept saying nongrievable. Every one of
16 those grievances that's in there says nongrievable,
17 housing concern; nongrievable, disciplinary matter. Then
18 I write -- then with the disciplinary matter, I wrote the
19 appeal out, and it just came back denied. As a matter of
20 fact, it didn't even come back. They just -- he just
21 told me it was denied. And they sent me back to medium
22 building.
23   Q. Okay. Maybe let me restate my question.
24       Where we are in the litigation now, are

### Page 91

1  you claiming a violation of due process?
2    A. Oh, no. Not --
3    Q. Okay.
4    A. -- as far as that's concerned.
5       No. That's just factual.
6    Q. Okay. Are you claiming a violation of equal
7  protection?
8    A. No. That's just factual too.
9    Q. Number of inmates that witnessed the
10 incident -- did I ask you that already?
11   A. Yes.
12   Q. Okay. Let me make sure.
13   A. I'm pretty sure you did.
14   Q. I think I asked you who you were playing in
15 the gym with.
16   A. Yes.
17   Q. And you gave me those names.
18   A. Yes.
19   Q. They weren't witnesses to the incident.
20 Right?
21   A. No.
22   Q. I don't know if I wrote that down.
23       Can you tell me again if there were any
24 inmate witnesses?

### Page 92

1    A. Like I stated here, there were inmate
2  witnesses, but a lot of them are not going -- a lot of
3  people ain't going to say nothing, because, you know, for
4  fear of retaliation. Some -- no. Nobody in the medium
5  building no more. A lot of them are in different
6  buildings. Some of them went home. But, I mean, as far
7  as like the assault, nobody -- no inmate witnessed the
8  assault. They just witnessed the other stuff that
9  happened.
10   Q. Are there any that you would potentially call
11 as a witness?
12   A. No.
13   Q. Okay. Then you say here that you had
14 difficulties with your neck on occasion. I thought you
15 said earlier that that resolved in a day.
16   A. It did. That was that night it was hurting
17 bad. But it resolved itself. That wasn't...
18   Q. You didn't write this that night, did you?
19   A. No.
20   Q. Okay.
21   A. But that was mainly concerning that night.
22   Q. Okay. Then you talk about the facility being
23 plagued with inmate assault and unnecessary inmates --
24 spraying inmates with pepper spray.

### Page 93

1    A. Yes.
2    Q. You were not sprayed with pepper spray;
3  correct?
4    A. No.
5    Q. Okay. That is not a part of the allegations
6  in this case?
7    A. No.
8    Q. So is it fair to say that most of this on the
9  second page was just put in there for you factually?
10 It's not alleging new claims?
11   A. No. It's not -- they're not new claims.
12   Q. Okay. In your interrogatories you talked
13 about a lump on your head.
14   A. Yes.
15   Q. Okay. You didn't mention that.
16       Was that the same as the scratch?
17   A. It was a small -- no. It was a small lump.
18 The scratch was on top of the lump. It was a little,
19 small, tiny lump. And that was what she didn't put in
20 the medical report.
21   Q. Did that also heal itself within a day?
22   A. I believe so, yes. I put ice on it. It went
23 down.
24   Q. Okay. In 2001, for your current